IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

BRENDA K. DRIVER                          )
                                          )
v.                                        )          NO. 2:08-0001
                                          )
MICHAEL J. ASTRUE,                        )
Commissioner of Social Security           )


To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain

judicial review of the final decision of the Commissioner of Social Security denying her Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security

Act ("the Act").

Upon review of the Administrative Record as a whole, the Court finds that the

Commissioner's determination that the plaintiff could perform her past job as an assembly worker

(tr.24) during the relevant time period is supported by substantial evidence in the record as required

by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the record (Docket Entry

No. 14) should be denied.


## I. INTRODUCTION

The plaintiff filed an application for DIB and SSI on March 11, 2004, alleging a disability

onset date of August 26, 2003, due to fibromyalgia, anxiety, depression, skin cancer, arthritis, and

diabetes. (Tr. 52, 56.) Her applications were denied initially and upon reconsideration. (Tr. 42-48, 49-50). A hearing before Administrative Law Judge ("ALJ") George L. Evans III was held on March 5, 2006. (Tr. 544-568.) The ALJ delivered an unfavorable decision on October 11, 2006 (tr. 18-25), and the plaintiff sought review by the Appeals Council. (Tr. 12.) On November 1, 2007, the Appeals Council denied the plaintiff's request for review (tr. 5-9), and the ALJ's decision became the final decision of the Commissioner.

## II. BACKGROUND

The plaintiff was born on September 30, 1954, and was 48 years old as of August 26, 2003, her alleged onset date. (Tr. 18, 38.) She completed high school (tr. 502) and worked as an assembly line machine operator for Kingston Timer for 27 years. (Tr. 73, 351.)

### A. Chronological Background: Procedural Developments and Medical Records

The plaintiff presented to Dr. David W. Gaw, an orthopedist, on November 29, 1990, with complaints of knee, hip, neck, and lower back pain after injuring herself at work. (Tr. 497.) She visited Dr. Gaw on a regular basis until November 13, 1996, and during that period of time he diagnosed her with soft tissue sprains of the left thoracic area, parascapular area, and lumbar spine. (Tr. 475-96.) X-rays and neurological exams of the plaintiff revealed no abnormalities (*id.*), and on December 13, 1990, he noted that an MRI of her lumbar spine showed some degenerative changes in her discs in her lumbar spine. (Tr. 497.) From November of 1990, through November

of 1996, Dr. Gaw prescribed Darvocet,[1] Decadron,[2] Flexeril,[3] Relafen,[4] Robaxin,[5] Wygesic,[6] gave her morphine injections (tr. 475-96), and recommended that she see a rheumatologist, participate in physical therapy, and increase her daily activities to improve her pain symptoms. (Tr. 490.) On March 11, 1993, Dr. Gaw also opined that the plaintiff had a 10% permanent impairment to her body as a whole as a result of medically documented pain for over six months and that she was not a candidate for surgery or active medical treatment except maintenance for "flare-ups of her pain, possibly physical therapy on and off, [and] anti-inflammatories and/or pain medications" as needed. (Tr. 481.) Dr. Gaw concluded that the plaintiff should be encouraged to "remain active, continue to work, [and] continue to exercise. . . ." *Id.*

The plaintiff saw Dr. Douglas G. Hooper, a family practitioner, from September 11, 1992, to March 2, 2006. (Tr. 163-229, 438-55.) During this period of time the plaintiff complained of anxiety, abdominal pain, skin abscesses and abrasions, nausea, dizziness, and pain in her hips, legs, side, back, and neck. *Id.* Dr. Hooper diagnosed the plaintiff with chronic back pain (tr. 168-69, 194-95, 205, 211, 213, 222, 228-29, 439), shoulder pain (tr. 177, 211), knee pain (tr. 444-46), osteoarthritis in her back and left knee (tr. 218, 438, 440), carpal tunnel syndrome (tr. 219), left wrist

---

[1] According to Drugs.com, Darvocet is "used to relieve mild to moderate pain with or without fever." Drugs.com, "Darvocet" at http://www.drugs.com/darvocet.html.

[2] Decadron is an anti-inflammatory. Saunders Pharmaceutical Word Book 204 (2009) ("Saunders").

[3] Flexeril is a skeletal muscle relaxant. Saunders at 294.

[4] Relafen is a "nonsteroidal anti-inflammatory drug (NSAID)" that is prescribed for "acute and chronic osteoarthritis and rheumatoid arthritis." Saunders at 607.

[5] Robaxin is a skeletal muscle relaxant. Saunders at 619.

[6] Wygesic is a pain reliever. Saunders at 767.

pain (tr. 197-99), temporomandibular joint disorder (tr. 170), anxiety (tr. 196, 211-13, 217, 220), depression (tr. 163-65A, 168, 219), fibromyalgia (tr. 163-65A, 168-69, 178-79, 186, 206-07, 214, 444, 449), an arm rash (tr. 208), and edema. (Tr. 229.)  He also prescribed Actos, Glucophage,[7] Robaxin, Skelaxin, Methocarbamol,[8] Effexor, Lexapro, Remeron, Celexa,[9] Duragesic, Darvocet,[10] Xanax, Alprazalom,[11] Clinoril, Mobic,[12] Arava,[13] Elavil,[14] and Estradiol.[15] (Tr. 163- 229, 438-55.)

On May 3, 2006,  Dr. Hooper completed a Medical Assessment of Ability to Do Work-Related Activities ("Medical Assessment") (tr. 469-72) and determined that in an eight hour workday the plaintiff was limited to occasionally lifting/carrying less than 10 pounds due to her fibromyalgia, polyarthritis, rheumatoid arthritis with widespread pain and fatigue, and morbid obesity, could stand/or walk for less than two hours and for twenty minutes without interruption, and could sit for four hours and for twenty minutes without interruption. (Tr. 469-70.) He noted plaintiff

---

[7] Actos and Glucophage are antidiabetic medications. Saunders at 11, 323.

[8] Robaxin, Skelaxin, and Methocarbamol are skeletal muscle relaxants. Saunders at 444, 619, 646.

[9] Effexor, Lexapro, Remeron, and Celexa are prescribed to treat depression and abnormal anxiety. Physicians Desk Reference 1153, 1160-61, 2924, 3504 (64th ed. 2010) ("PDR").

[10] A Duragesic patch and Darvocet are pain relievers. Saunders at 202, 248.

[11] Xanax and Alprazalom are prescribed to treat panic disorders and agoraphobia. Saunders at 33, 768.

[12] Clinoril and Mobic are used to treat "osteoarthritis, rheumatoid arthritis, ankylosing spondylitis . . . and other inflammatory conditions." Saunders at 168, 457.

[13] Arava is an anti-inflammatory that is prescribed for rheumatoid arthritis. Saunders at 61.

[14] Elavil is an anti-depressant. Saunders at 256.

[15] Estradiol is "estrogen replacement therapy for the treatment of postmenopausal disorders and the prevention of osteoporosis." Saunders at 270.

used a cane, could rarely balance, and could never climb, crouch, kneel, crawl, or stoop. (Tr. 470.) Dr. Hooper opined that plaintiff's ability to reach, handle, finger, feel, and push/pull were impaired due to her chronic pain, tingling and numbness in her hands; that she suffers from skin cancer; and that her vision was impaired by "extremely high sensitivity to light." (Tr. 471.) He further opined that the plaintiff should not be exposed to heights, moving machinery, extreme cold, chemicals, dust, fumes, or vibrations. *Id.* Finally, Dr. Hooper noted that the plaintiff's limitations were normally expected from the type and severity of her diagnoses, that the diagnoses were confirmed by objective findings, and that his opinion was based primarily on the plaintiff's subjective complaints. (Tr. 472).

The plaintiff also underwent additional MRIs and x-rays, as well as a CT scan. In 2001, x-rays of the plaintiff's lumbar spine and right hand were "normal" and "negative" (tr. 200-01), x-rays of her left hand revealed a fracture (tr. 203), and x-rays of her abdomen showed that she had "acalulous cholecystitis or possibly biliary dyskinesia." (Tr. 192.) In 2002, a CT scan of the plaintiff's abdomen and pelvis was normal (tr. 182) and an MRI of her right shoulder showed that she had "[e]xtensive rotator cuff tendinitis" and impingement syndrome. (Tr. 175-76.) A September 22, 2003, MRI of the plaintiff's lumbar spine revealed that she had mild degenerative disc disease without significant impingement. (Tr. 166, 400.) In 2005, an MRI of her knee showed evidence of a small joint effusion (tr. 398) and an x-ray of her lumbar spine revealed "osteophytic lipping." (Tr. 468.)

From June 22, 1998, to May 11, 2004, Dr. Kathleen Clark, a dermatologist, examined the plaintiff on multiple occasions, diagnosed her with rosacea (tr. 256),[16] actinic keratosis (260, 262, 336, 344),[17] lentigos (256, 258, 262, 266),[18] seborrheic keratosis (tr. 256, 258, 260, 262, 266, 314, 315, 325, 342),[19] and carcinoma (tr. 256, 258, 260, 262, 264, 266, 315, 317, 320, 327, 329, 332, 335, 337, 339, 342, 344, 347), and excised multiple skin lesions that tested positive for skin cancer. (260-314, 425-30.)    The plaintiff also presented to Dr. Starla K. Meigs, an optometrist, on several occasions between August 9, 2000, and February 27, 2006. (Tr. 431-37.)  Dr. Meigs diagnosed her with diabetes, myopia,[20] astigmatism,[21] and photophobia,[22] and prescribed corrective lenses with a dark tint. *Id.*

Upon referral from Dr. Hooper, the plaintiff presented to Dr. David S. Knapp, a rheumatologist, from July 2, 2002, to August 29, 2003. (Tr. 133-52.)  On July 2, 2002, Dr. Knapp diagnosed the plaintiff with "a fairly typical case of fibromyalgia syndrome," noted that "her new

---

[16] Rosacea is skin disease that usually affects an individual's face and produces pus-filled bumps or pustules. Dorland's Illustrated Medical Dictionary 1642 (30th ed. 2003) ("Dorland's").

[17] Actinic keratosis is a red or skin colored growth that may develop into a squamos cell carcinoma. Dorland's at 975.

[18] Lentigos are "small, flat, tan to dark brown or black, macular melanosis on the skin resembling a freckle." Dorland's at 1015.

[19] Seborrheic keratosis "is one of the most common types of noncancerous (benign) skin growths in older adults. MayoClinic.com, "Seborrheic keratosis," at http://www.mayoclinic.com/health/seborrheic-keratosis/DS00846.

[20] Myopia is commonly known as nearsightedness. Dorland's at 1214.

[21] Astigmatism is the "unequal curvature of the refractive surfaces of the eye that results in blurred vision." Dorland's at 168.

[22] Photophobia is the "abnormal visual intolerance of light." Dorland's at 1431.

clinical developments suggest a developing case of rheumatoid arthritis," and prescribed Prednisone.[23] (Tr. 148.) The plaintiff returned to Dr. Knapp two weeks later and reported that "the Prednisone helped a great deal" and that taking Xanax allowed her to get more sleep. (Tr. 146.) Dr. Knapp diagnosed her with rheumatoid arthritis and "tender points typical for fibromyalgia," and he prescribed Prednisone, Methotrexate,[24] and injections of Kenalog[25] and Xylocaine.[26] *Id.* On August 30, 2002, Dr. Knapp diagnosed the plaintiff with fibromyalgia, rheumatoid arthritis that was "steroid responsive," and hip bursitis, and he noted that she was having significant shoulder pain and that although the Methotrexate was helping her, it also exacerbated her skin lesions. (Tr. 144.) The plaintiff returned to Dr. Knapp on October 11, 2002, and he determined that she had trochanteric bursitis of the left hip, myofascial neck pain, bursitis tendonitis of the right shoulder, rheumatoid arthritis, fibromyalgia, multiple skin cancers, and "what sounds like sleep apnea." (Tr. 141.) Dr. Knapp prescribed injections of Kenalog and Xylocaine, Methotrexate, and Zanaflex,[27] and referred her for an outpatient sleep apnea study. *Id.*

On November 11, 2002, Dr. Knapp examined the plaintiff and noted that she had skin lesions, numerous areas of tenderness, and puffy hands and wrists. (Tr. 140.) He opined that her sleep study was inaccurate[28] and prescribed Arava since it was not "implicated in any aggravation

---

[23] Prednisone is anti-inflammatory medication. Saunders at 575.

[24] Methotrexate is an antirheumatic prescribed for adult and juvenile rheumatoid arthritis. Saunders at 444.

[25] Kenalog is a corticosteroidal anti-inflammatory. Saunders at 388.

[26] Xylocaine is a local anesthetic. Saunders at 771.

[27] Zanaflex is a muscle relaxant. Saunders at 773.

[28] The results from this 2002 sleep study are not in the record.

of any skin cancers as has been described with [M]ethotrexate." On December 16, 2002, the plaintiff presented to Dr. Knapp with arm and wrist pain. (Tr. 137.) Dr. Knapp noted that she was depressed, had swelling in her ankles, and had tender points in her hands, right wrist, and left elbow. (Tr. 137-38.) He prescribed Prednisone and Arava. (Tr. 137.)

On February 12, 2003, the plaintiff returned to Dr. Knapp with complaints of abdominal, left hip, and shoulder blade pain, and he diagnosed her with joint pain "that has responded to Arava" and sleep apnea "that would benefit from a CPAP [continuous positive airway pressure] machine." (Tr. 136.) He prescribed Arava and the plaintiff received two trigger point injections beneath her shoulder blades. *Id.* Nearly a month later, the plaintiff presented to Dr. Knapp with complaints of left shoulder, lower back, and hip pain. (Tr. 134.) He diagnosed her with left hip tendinitis, myofascial back pain, and possible bicipital tendinitis or shoulder bursitis. *Id.* The plaintiff also received two trigger point injections and Dr. Knapp discontinued her Arava prescription since it was not providing her with the pain relief that he thought she needed. *Id.* On August 26, 2003, Dr. Knapp examined the plaintiff and diagnosed her with left hip bursitis, myofascial shoulder pain, fibromyalgia, and sleep apnea. (Tr. 133.) The plaintiff received two trigger point injections and Dr. Knapp prescribed Skelaxin. *Id.*

Upon referral from Dr. Knapp, Dr. Thomas Zurawek conducted two nocturnal polysomnogram studies on the plaintiff on September 4, 2003, and September 5, 2003. (Tr. 154-61.) The first study indicated that the plaintiff had severe obstructive sleep apnea and "significant upper airway resistance syndrome" that resulted in snoring and "decreased sleep efficiency." (Tr. 154.) Dr. Zurawek recommended that the plaintiff lose weight, undergo a CPAP titration, and consider having an oral surgical evaluation or an ears, nose, and throat evaluation. *Id.* The second sleep study

also revealed that the plaintiff had sleep apnea and a respiratory disturbance. (Tr. 156.) On November 3, 2003, Dr. Zurawek conducted a CPAP titration on the plaintiff, which resolved her respiratory problems and snoring and improved her ability to sleep, and he recommended that she continue using CPAP titration. (Tr. 153.)

On November 26, 2003, the plaintiff presented to Volunteer Behavioral Health Care System Mental Health Center (VBHCS) complaining of worsening chronic pain and resulting depression. (Tr. 249.) She was diagnosed with depressive disorder, not otherwise specified ("NOS"), anxiety, fibromyalgia, and diabetes, and was assigned a Global Assessment of Functioning ("GAF") score of 55.[29] (Tr. 253.) The plaintiff met with a therapist once in December of 2003, and again in January of 2004, and both sessions focused on her depression, anxiety, and loss of activity. (Tr. 247-48.) On March 15, 2004, the plaintiff was discharged from VBHCS because her ability to function improved and she was better able to cope with her pain, had less depression and anxiety, and was not isolated in her home, although her GAF score remained 55. (Tr. 246.) However, the plaintiff was instructed to learn relaxation methods and to participate in weekly individual therapy through June 10, 2004.[30] *Id.*

---

[29] The GAF scale considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 43 (4th ed. 2000) ("DSM-IV-TR"). A GAF score within the range of 51-60 means that the plaintiff has "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning." *Id.*

[30] Whereas page 1 appears to reflect the plaintiff's status as of December 10, 2003 (tr. 245), page 2 appears to reflect her status as of March 15, 2004. (Tr. 246.) The plaintiff suggests that she did not continue with counseling because she did not have insurance. Docket Entry No. 15, at 19; Tr. 566. Although the Court acknowledges that what appears to be the discharge summary includes a target date of June 10, 2004, for completion of individual therapy and learning relaxation methods, what appear to be the listed reasons for discharge do not include lack of insurance.

On June 26, 2004, Dr. Linda Blazina, a Tennessee Disability Determination Services ("DDS") psychologist, completed a mental status exam on the plaintiff (tr. 349-53) and the plaintiff reported that she had anxiety, sleep disturbances, depression, irritability, and chronic pain that exacerbated her other conditions. (Tr. 350.) Dr. Blazina noted that plaintiff was alert and cooperative during the interview, had normal memory and ability to concentrate, and appeared to be depressed and mildly anxious. (Tr. 350.) The plaintiff stated that she dresses and bathes herself but that it "takes her a long time due to her chronic pain and physical problems," shops independently but that "her son and his girlfriend take her to the grocery store," "drives her car adequately," does laundry and light dusting around her home, prepares simple meals, attends church, goes out for an occasional meal, sees family members once a month, and "is much more inactive physically than she was prior to the onset of her health problems." (Tr. 351-52.) Dr. Blazina diagnosed the plaintiff with "[a]djustment disorder with mixed anxiety and depressed mood," assigned her a GAF score of 65 to 70,[31] and opined that her ability to understand and remember and to sustain concentration and persistence was not "noticeably limited." (Tr. 353.) She also concluded that plaintiff's ability to interact socially was not significantly limited and that her ability to adapt to changes in a work routine and tolerate stress was moderately limited. *Id.*

On July 6, 2004, Dr. Jerry Lee Surber, a DDS family practitioner, completed a physical evaluation on the plaintiff (tr. 355-59) and noted that she was obese, had "excruciating pain to light touch" near her dorsolumbar spine, had "tenderness" to light touch on her shoulders, elbows, hips, knees, ankles, and wrists, and demonstrated "equal upper and lower limb strength at 5/5+, with 5/5+

---

[31] A GAF score within the range of 61-70 means that the plaintiff has "[s]ome mild symptoms [or] some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.

grip strength." (Tr. 356-58.)  Dr. Surber diagnosed the plaintiff with "[f]ibromyalgia, with associated neuropathic pain, involving the [plaintiff's] lower back, left hip, arm, shoulders and neck, and intermittent hand and feet numbness," "non-insulin-dependent diabetes mellitus," hypertension, mild COPD, and sleep apnea. (Tr. 357-58.)  Dr. Surber opined that in an eight hour day the plaintiff "could frequently lift up to 10 pounds for one-third to two-thirds" of the day, stand and walk up to six hours with normal breaks, or sit up to six hours with normal breaks. (Tr. 358.)

On July 4, 2004, non-examining DDS psychiatrist Dr. William Regan completed a Psychiatric Review Technique Form ("PRTF") on the plaintiff (tr. 364-77) and diagnosed her with affective disorders. (Tr. 364, 367.)  He concluded that the plaintiff had mild restriction of activities of daily living and mild difficulties maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation.[32] (Tr. 374.)  Dr. Regan opined that although the plaintiff's "allegations are credible," she would not be precluded from all work related activities. (Tr. 376.)

Dr. Regan also completed a mental Residual Functional Capacity ("RFC") assessment on the plaintiff and opined that she was moderately limited in her ability to understand, remember, and carry out detailed instructions; in her "ability to maintain attention and concentration for extended periods;" in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;" in her "ability to interact appropriately with the general public;" and in her "ability to respond appropriately to changes in the work setting." (Tr. 378-79.)

---

[32] Dr. Regan did not specify the episode or episodes of decompensation that he noted.

On July 26, 2004, non-examining DDS physician Dr. Louise G. Patikas[33] completed a physical RFC assessment on the plaintiff (tr. 381-88) and opined that the plaintiff could occasionally lift/carry up to 50 pounds, could frequently lift/carry up to 25 pounds, and could sit/stand/walk for about six hours in an eight-hour workday with normal breaks. (Tr. 382.) Dr. Patikas found that the plaintiff was unlimited in her ability to push/pull and that she had credibility issues due to her "extremely overreactive" response to light touch. (Tr. 382-83.)

On August 8, 2005, Mary Matthews, a DDS licensed psychological examiner ("L.P.E."), completed an evaluation on the plaintiff (tr. 538-43) and found that her memory and ability to think were normal, that she functioned "in the average range intelligence," and that she was "extremely depressed." (Tr. 540.) The plaintiff reported that her son does most of the cleaning around the house, that she does the laundry and shopping, that she goes to church every Wednesday and Sunday, and that she has difficulty sleeping. (Tr. 541.) Ms. Mathews opined that, due to her severe depression, the plaintiff was moderately limited "in her ability to understand, remember and carryout [sic] more detailed instructions" and "in her ability to adapt to changes in the work setting;" was markedly limited "in her ability to maintain concentration, persistence and pace;" and was severely limited "in her ability to handle the everyday stressors of the workplace." (Tr. 542.) Ms. Mathews also noted that the plaintiff used a cane, walked with a limp, and "had difficulty getting up and down from a seated position;" diagnosed the plaintiff with major depressive disorder, chronic pain, sleep apnea, fibromyalgia, and diabetes; and concluded that the plaintiff was a "credible source of information." *Id.*

---

[33] Dr. Patikas is not a practicing physician and, although she is not board certified, she was a pediatric intern and resident at Vanderbilt in 1965-66. (Tr. 396.)

On August 29, 2005, DDS consultative physician Dr. Roy Johnson examined the plaintiff (tr. 464-68) and found that she had tenderness during her spinal exam and in her left buttock area; a full range of motion in her neck, shoulders, elbows, wrists, hips, knees, and ankles; a grip strength of 5 out of 5, and a normal gait. (Tr. 466.) He noted that she was unable to squat and rise, perform a heel to toe walk, or balance on one foot. *Id.* Dr. Johnson concluded that the plaintiff was overweight and had arthritis, a history of fibromyalgia, hypertension, non-insulin diabetes mellitus, and low back syndrome. (Tr. 467.) Dr. Johnson opined that in an eight hour workday, the plaintiff could stand up to three hours, sit up to six hours, and "should be able to variate standing and sitting as needed." *Id.* He also determined that she could occasionally lift up to five pounds and that "her work activity should not exceed any restrictions placed on her by her treating physician." *Id.*

### B. Hearing Testimony

At the hearing before the ALJ, the plaintiff was represented by counsel, and she testified that she completed high school (tr. 550), lives alone, has a driver's license and was able to drive to the hearing by herself (tr. 551), weighs about 280 pounds (tr. 552), and had previously worked as a machine operator making hand dryers. (Tr. 553.) She stated that the easiest job she had was assembling hand dryers and that her employer altered the requirements of her job to accommodate her needs so that she was able to sit and stand at will and did not have to lift or carry items. (Tr. 553-54.) The plaintiff testified that her pain caused her to leave work for a few hours a day, take days off, and forced her to eventually quit. (Tr. 554.)

The plaintiff stated that she suffered from fibromyalgia, arthritis, diabetes, anxiety, and depression. (Tr. 555-56.) She testified that fibromyalgia causes her to "hurt all over;" makes her

13

shoulders, hips, legs, and hands swell and burn; makes her hands and feet "tingle and go numb;" and forces her to use an "assistive device" to prevent her from falling. (Tr. 557-58.) The plaintiff also stated that her depression and anxiety are related to her physical problems (tr. 556-57) and that although a CPAP machine has helped her to sleep at night, she still has difficulty sleeping due to her pain and sleep apnea. (Tr. 558-59.) The plaintiff also testified that she has active skin cancer and lesions all over her body, and that although the lesions did not affect her ability to sit, stand, or walk, they were a source of embarrassment to her. (Tr. 559-60.) She further testified that her eyes were light sensitive and that she sustained a concussion and a left knee injury in a car accident in 2007. (Tr. 560-62.)

The plaintiff testified that during a typical day she makes simple meals because she cannot stand long enough to prepare full meals, sits and reads her Bible, watches TV, and performs light household chores such as dusting and laundry. (Tr. 562-63.) She stated that she usually does not "make it out of the living room" and spends most of her day resting, that her son does her housework and yardwork, that she visits her father "every now and then," and that she attends church infrequently and when she "feel[s] like it." (Tr. 562-64.)

### III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on October 11, 2006. (Tr. 18-25.) Based on the record, the ALJ made the following findings:

1.      The claimant met the insured status requirements of the Social Security Act through December 31, 2008.

2.    The claimant has not engaged in substantial gainful activity since August 26, 2003, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.,* 416.920(b) and 416.971 *et seq.*).

* * *

3.    The claimant has the following severe impairments: fibromyalgia, arthritis, diabetes mellitus, hypertension, anxiety, depression and sleep apnea (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

* * *

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work with a required sit/stand option.  Light work, as defined by the regulations, involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm and leg controls.  To be considered capable of performing a full or wide range of light work, an individual must have the ability to do substantially all of these activities.  If an individual can do light work, it will be determined that the individual can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time [20 C.F.R. 404.1567(b), 416.967(b) (1994)].

* * *

5.    The claimant is capable of performing past relevant work as an assembly worker.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

* * *

6.    The claimant has not been under a "disability," as defined in the Social Security Act, from August 26, 2003 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 20-25.)

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2008); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to

support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must

come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595; *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled.[34] *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

**B. The five step inquiry**

In this case, the ALJ resolved the plaintiff's case at step four of the five-step process. (Tr. 24.) At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity

---

[34] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied. *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

since August 26, 2003, the alleged onset date of disability. (Tr. 20.)  At step two, the ALJ found that the plaintiff's fibromyalgia, arthritis, diabetes mellitus, hypertension, anxiety, depression, and sleep apnea were severe impairments. *Id.*   At step three, the ALJ determined that the plaintiff's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 21.)  At step four, the ALJ determined that the plaintiff could  perform her past relevant work as an assembly worker. (Tr. 24.)

### C. Plaintiff's Assertions of Error

The plaintiff contends that the ALJ erred in rejecting the opinion of plaintiff's treating physician and by failing to consider the combined effect of plaintiff's multiple impairments, including pain. Docket Entry No. 15, at 3, 6-26.  The plaintiff also argues that the ALJ erred by finding plaintiff's testimony to be not entirely credible and in concluding that she had the RFC to perform light work and that she could return to her past work. Docket Entry No. 15, at 3-6, 26-31.

### 1. The ALJ properly assessed the medical opinions of the plaintiff's treating physician.

The plaintiff contends that the ALJ erred by "rejecting" Dr. Hooper's Medical Assessment. Docket Entry No. 15, at 22-26.  Given the regularity with which Dr. Hooper examined the plaintiff (tr. 163-229, 438-55), he is classified as treating source under 20 C.F.R. §§ 404.1502 and 416.902.[35]

---

[35] A treating source, defined by 20 C.F.R. § 416.902, is

> your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship

Treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone." 20 C.F.R. § 404.1527(d)(2), 416.927(d)(2). Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

The ALJ did not assign controlling weight to Dr. Hooper's Medical Assessment. (Tr. 24.) Specifically, the ALJ concluded that Dr. Hooper's Medical Assessment was inconsistent with the medical evidence in the record. *Id.*

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in 20 C.F.R. 404.1527*

---

with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).

. . . .'" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006) (quoting 20 C.F.R. § 404.1527(d)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). *See also Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (quoting *Wilson*, 378 F.3d at 544). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*

The ALJ focused on the factor of inconsistency in finding that Dr. Hooper's Medical Assessment was not "supported by the medical evidence as a whole." (Tr. 24.) Dr. Hooper and three consultative DDS physicians, Dr. Surber, Dr. Patikas, and Dr. Johnson, all completed physical assessments on the plaintiff. (Tr. 355-59, 381-88, 464-72.) Dr. Hooper opined that the plaintiff could occasionally lift/carry less than 10 pounds, could stand/walk less than two hours or sit for four hours in an eight hour workday, should never climb, crouch, kneel, crawl, or stoop, and would have difficulty handling, fingering, feeling, pushing, and pulling objects (tr. 469-70); Dr. Surber found that the plaintiff could frequently lift/carry up to 10 pounds and stand/walk or sit up to six hours in an eight hour workday (tr. 358); Dr. Patikas determined that the plaintiff could lift/carry 25 pounds

frequently and 50 pounds occasionally, could stand/walk or sit for about six hours in an eight hour workday, and was not limited in her ability to push or pull objects (tr. 382); and Dr. Johnson found that the plaintiff could occasionally lift/carry "up to 5 pounds" and stand up to three hours and sit up to six hours in an eight hour workday. (Tr. 467.)

Dr. Hooper's Medical Assessment is the most restrictive evaluation in the record. Dr. Hooper, Dr. Surber, Dr. Patikas, and Dr. Johnson each arrived at different conclusions regarding how much the plaintiff could lift/carry, and although Dr. Hooper's assessment of the plaintiff's ability to stand/walk in an eight hour day was similar to that of Dr. Johnson's, it differed greatly from that of Dr. Surber and Dr. Patikas, who determined, respectively, that the plaintiff could stand/walk for "up to" and "about" six hours. (Tr. 355-59, 381-88, 464-72.) Dr. Hooper also found that in an eight hour workday the plaintiff could sit for four hours (tr. 470), but Dr. Surber, Dr. Patikas, and Dr. Johnson all found that she could sit for "up to" or "about" six hours. (Tr. 358, 382, 467.) Additionally, Dr. Hooper concluded that the plaintiff's ability to handle, finger, feel, and push/pull were impaired (tr. 471), but Dr. Surber noted that her upper and lower limb strength and grip strength were five out of five (tr. 358), Dr. Patikas found that her ability to push/pull was unlimited (tr. 382), and Dr. Johnson determined that she had a full range of motion in her upper extremities and five out of five grip strength. (Tr. 466.)

Besides Dr. Hooper's Medical Assessment being the most restrictive in the record and inconsistent with the three other evaluations, as discussed *supra*, it is also not supported by his own medical findings. Dr. Hooper opined that the plaintiff's ability to finger, reach, handle, feel, push, and pull were all impaired due to tingling and numbness in her hands. (Tr. 471.) However, over the course of Dr. Hooper's thirteen year examination history of the plaintiff, the plaintiff only

complained of tingling in her hands once, on May 1, 1995 (tr. 219), and she never reported having numbness in her hands. In March of 2001, the plaintiff fractured her left fifth metacarpal bone, commonly known as the pinky finger (tr. 197-99, 203), but it healed within two months. (Tr. 196.) Further, Dr. Hooper noted at the end of his Medical Assessment that while his "diagnosis in this case [was] confirmed by objective findings," his opinion was based "primarily on the [plaintiff's] subjective complaints." (Tr. 472.)

The ALJ did not err in assigning less than significant weight to Dr. Hooper's Medical Assessment. He focused on the factor of inconsistency, provided "good reasons," as required by SSR 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)), for awarding minimal weight to Dr. Hooper's Medical Assessment (tr.24), and there is substantial evidence in the record to support his determination.

The plaintiff also claims that the ALJ should have given controlling weight to Dr. Hooper's letter from December 20, 2003, in which he opined that the plaintiff is "unable to work due to [her] fibromyalgia" and that he did not "foresee her returning to work again as her fibromyalgia has continued to worsen over the last 4 yrs. [and] is expected to continue to worsen." (Tr. 163.) The Regulations clearly provide that a "statement by a medical source that [the plaintiff] is 'disabled' or 'unable to work' does not mean" that the Commissioner will find the plaintiff disabled since that is a determination that is reserved for the Commissioner. 20 C.F.R. §§ 404.1527(e)(1)-(2), 416.927(e)(1)-(2). Therefore, any findings submitted on issues reserved to the Commissioner, such as whether the plaintiff is "disabled" or "unable to work," are not entitled to any particular weight. 20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3).

**2. The ALJ correctly determined that the plaintiff did not meet or equal Listing 14.00 or Listing 1.02A.**

The plaintiff contends, generally, that her fibromyalgia, arthritis, skin cancer, morbid obesity with sleep apnea, depression, anxiety, chronic pain, fatigue, and diabetes meet or medically equal one of the listed impairments, Docket Entry No. 15, at 6-11, and, specifically, that her fibromyalgia meets "the criteria of Listing 14.00 and subparts." Docket Entry No. 15, at 11. "'[T]he burden of proof lies with the [plaintiff] at steps one through four of the [sequential disability benefits analysis],' including proving presumptive disability by meeting or exceeding a Medical Listing at step three." *Little v. Astrue*, 2008 WL 3849937, at *4 (E.D.Ky. Aug. 15, 2008) (quoting *Her*, 203 F.3d at 391). Thus, the plaintiff "'bears the burden of proof at Step Three to demonstrate that he has or equals an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1.'"[36] *Little*, 2008 WL

---

[36] There are three ways in which a plaintiff can show that her combination of impairments is equivalent to a listed impairment:

(1)(i) If you have an impairment that is described in the Listing of Impairments in appendix 1 of subpart P of part 404 of this chapter, but--

(A) You do not exhibit one or more of the findings specified in the particular listing, or

(B) You exhibit all of the findings, but one or more of the findings is not as severe as specified in the particular listing,

(ii) We will find that your impairment is medically equivalent to that listing if you have other findings related to your impairment that are at least of equal medical significance to the required criteria.

(2) If you have an impairment(s) that is not described in the Listing of Impairments in appendix 1 of subpart P of part 404 of this chapter, we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairment(s) are at least of equal medical significance to those of a listed impairment, we will find that your impairment(s) is medically equivalent to the analogous listing.

25

3849937, at *4 (quoting *Arnold v. Comm'r of Soc. Sec.*, 238 F.3d 419 (table), 2000 WL 1909386, at *2 (6th Cir. Dec. 27, 2000)).  The plaintiff's impairment must meet all of the listing's specified medical criteria and "[a]n impairment that meets only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530-532 (1990).  If the plaintiff does demonstrate that his impairment meets or equals a listed impairment, then the ALJ "'must find the [plaintiff] disabled.'" *Little*, 2008 WL 3849937, at *4 (quoting *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir.1987)).

Listing 14.00 includes an array of impairments, including lupus, vasculitis, sclerosis and scleroderma, polymyositis and dermatomyositis, undifferentiated and mixed connective tissue disease, immune deficiency disorders, human immunodeficiency virus ("HIV"), inflammatory arthritis, and Sjogren's syndrome. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00-14.10.  Although the plaintiff failed to specify which Listing the Court should address, *see* Docket Entry No. 15, at 6-11, the Court finds that the plaintiff's impairment is most appropriately analyzed under Listing 14.09

---

(3) If you have a combination of impairments, no one of which meets a listing described in the Listing of Impairments in appendix 1 of subpart P of part 404 of this chapter (see § 416.925(c)(3)), we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairments are at least of equal medical significance to those of a listed impairment, we will find that your combination of impairments is medically equivalent to that listing.

20 C.F.R. §§ 404.1526(b), 416.926(b).  *See also Sullivan v. Zebley*, 493 U.S. 521, 531, 110 S.Ct. 885, 107 L.Ed.2d 967(1990) ("For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to all the criteria for the one most similar listed impairment.")

for inflammatory arthritis.[37] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.09.  In order to meet or equal

Listing 14.09, the plaintiff must satisfy subsections A, B, C, or D of the Listing and document those

requirements in accordance with Listing 14.00D6. *Id.*

To meet subsection A of Listing 14.09, the plaintiff must demonstrate persistent

inflammation or persistent deformity in either "[o]ne or more [of her] major peripheral

weight-bearing joints resulting in the inability to ambulate effectively"[38] or "[o]ne or more major

peripheral joints in each upper extremity resulting in the inability to perform fine and gross

movements effectively."[39] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.09A(1)-(2).  Although the

---

[37] Although the plaintiff did not mention Listing 14.09 in her memorandum, plaintiff's counsel did specify that listing during the hearing before the ALJ. *See* Tr. 550.

[38] The Regulations define the "[i]nability to ambulate effectively" as:

> extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

> *To ambulate effectively*, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b(1)-(2) (internal citations omitted).

[39] The Regulations define the "[i]nability to perform fine and gross movements effectively" as:

plaintiff was diagnosed with osteoarthritis in her back and left knee (tr. 218, 438, 440), rheumatoid arthritis (tr. 141, 144, 146, 469-72), arthritis (tr. 467), and joint pain (tr. 136), the record evidence and the plaintiff's testimony do not indicate that she suffers from persistent inflammation or a persistent deformity that causes her to ambulate ineffectively or to be unable to perform fine and gross movements effectively. *Id.* The record medical evidence shows that the plaintiff had minimal swelling and no deformities in her joints (tr. 140, 357), that x-rays of her right hand and wrist were negative and revealed "no joint space narrowing or erosions to suggest an inflammatory or degenerative arthropathy" (tr. 201), that an MRI of her left knee showed only a "small joint effusion" (tr. 398), that she had five out of five upper and lower limb strength (tr. 357-58) and grip strength (tr. 357-58, 466), and that she had a full range of motion in her neck, shoulders, elbows, wrists, hips, knees, and ankles. (Tr. 466.) The plaintiff also reported to Dr. Blazina, and testified at her hearing, that she is able to shop independently, dress and bathe herself with some difficulty, drive a car, attend church, visit family, prepare simple meals, and do laundry and light dusting around her house. (Tr. 351-52, 562-64.) Although the plaintiff uses a cane to help her walk (tr. 542),

---

an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2c.

neither the record medical evidence or the plaintiff's own testimony shows that she meets subsection A of Listing 14.09.

To satisfy subsection B of Listing 14.09, the plaintiff must show that she has inflammation or persistent deformity in "one or more [of her] major peripheral joints" with the "[i]nvolvement of two or more organs/body systems with one of the organs/body systems involved to at least a moderate level of severity" and "[a]t least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.09B. The Regulations also provide that the extra-articular[40] features of inflammatory arthritis may also enable the plaintiff to meet Listing 14.09B. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00D6e(ii).[41] As discussed *supra*, the plaintiff was diagnosed with osteoarthritis and rheumatoid arthritis (tr. 141, 144, 146, 218, 438, 440, 469-72) but other examinations (tr. 140, 357), x-rays (tr. 201), an MRI (tr. 398), limb and grip strength evaluations (tr. 357-58, 466), and a range of motion assessment (tr. 466) all indicate that her joints were minimally affected and were not deformed. Additionally,

---

[40] Extra-articular means "situated or occurring outside a joint." Dorland's at 658.

[41] The Regulations explain that

[e]xtra-articular features of inflammatory arthritis may involve any body system; for example: Musculoskeletal (heel enthesopathy), ophthalmologic (iridocyclitis, keratoconjunctivitis sicca, uveitis), pulmonary (pleuritis, pulmonary fibrosis or nodules, restrictive lung disease), cardiovascular (aortic valve insufficiency, arrhythmias, coronary arteritis, myocarditis, pericarditis, Raynaud's phenomenon, systemic vasculitis), renal (amyloidosis of the kidney), hematologic (chronic anemia, thrombocytopenia), neurologic (peripheral neuropathy, radiculopathy, spinal cord or cauda equina compression with sensory and motor loss), mental (cognitive dysfunction, poor memory), and immune system (Felty's syndrome (hypersplenism with compromised immune competence)).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00D6e(iii).

the record evidence does not show that two or more of the plaintiff's organs/body systems had extra-articular features. The plaintiff was diagnosed with COPD (tr. 358) and mild degenerative disc disease (tr. 166, 400), but neither impairment reached the level of severity of the extra-articular features in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.00D6e(iii) for lung and spinal impairments. Therefore, the plaintiff's impairments do not meet subsection B of Listing 14.09.

The plaintiff does not meet subsection C of Listing 14.09 because there is no medical evidence in the record indicating that she suffers from or was diagnosed with ankylosing spondylitis[42] or other spondyloarthropathies. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.09C.

Finally, to meet subsection D of Listing 14.09 the plaintiff must show that she has "[r]epeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)" and marked limitations of her daily activities, social functioning, or ability to complete tasks "in a timely manner due to deficiencies in concentration, persistence, or pace." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.09D. While the plaintiff was diagnosed with osteoarthritis and rheumatoid arthritis (tr. 141, 144, 146, 218, 438, 440, 469-72), the record evidence does not show that she suffered from "at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.09D.

The plaintiff also did not satisfy the three sub-requirements of Listing 14.09D. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 14.09D1-3. As previously discussed, the plaintiff was able to shop independently, dress and bathe herself with some difficulty, drive a car, attend church, visit family,

---

[42] Ankylosing spondylitis is a "form of degenerative joint disease that affects the spine." Dorland's at 1742.

prepare simple meals, and do laundry and light dusting around her house. (Tr. 351-52, 562-64.)

Further, although Ms. Mathews, a DDS psychological examiner, determined that the plaintiff was

markedly limited "in her ability to maintain concentration, persistence, and pace" and was severely

limited "in her ability to handle the everyday stressors of the workplace" (tr. 542), Dr. Blazina and

Dr. Regan, both DDS physicians, found the effect of the plaintiff's mental impairments to be less

severe. Dr. Blazina concluded that the plaintiff's ability to sustain concentration and persistence was

not "noticeably limited" and that her ability to interact socially was not "significantly limited"

(tr. 353), and Dr. Regan determined that her activities of daily living and social functioning were

only mildly restricted and that she had only moderate difficulty in maintaining concentration,

persistence, or pace. (Tr. 378-79.) In sum, the medical record evidence and plaintiff's own

testimony indicate that she does not meet Listing 14.09D.

In addition to arguing that she meets Listing 14.09, the plaintiff contends that she meets

Listing 1.02A and is disabled due to major joint dysfunction because her obesity "is of such a level

that in [sic] results in an inability to ambulate effectively. . . ." Docket Entry No. 15, at 20-21.

Listing 1.02A provides that disability caused by major joint dysfunction is

> [c]haracterized by gross anatomical deformity (e.g., subluxation, contracture, bony
> or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of
> limitation of motion or other abnormal motion of the affected joint(s), and findings
> on appropriate medically acceptable imaging of joint space narrowing, bony
> destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or
> ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02A. The plaintiff also cites Social Security Ruling 02-1p

for support, noting that it "provides that the Social Security Administration may find that obesity,

*by itself*, is medically equivalent to a listed impairment." Docket Entry No. 15, at 20 (emphasis in original); Soc. Sec. Rul. ("SSR") 02-01p, 2000 WL 628049, at 4 ("If an individual has the medically determinable impairment obesity that is 'severe' . . . we may find that the obesity medically equals a listing."). SSR 02-01p further provides that

> if the obesity is of such a level that it results in an inability to ambulate effectively, as defined in sections 1.00B2b or 101.00B2b of the listings, it may substitute for the major dysfunction of a joint(s) due to any cause (and its associated criteria), with the involvement of one major peripheral weight-bearing joint in listings 1.02A or 101.02A, and we will then make a finding of medical equivalence.

*Id.* at 5.

Although Dr. Hooper and Dr. Surber noted that the plaintiff was obese (tr. 356, 469-70) and the record indicates that she uses a cane (tr. 470, 542), she does not meet Listing 1.02A because her obesity did not cause her to ambulate ineffectively. As discussed *supra*, Section 1.00B2b provides examples of ineffective ambulation, such as "the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b. Since the plaintiff only uses one cane to assist her with walking (tr. 470, 542) and is still able to carry out routine activities, such as shopping, attending church, visiting family, and doing laundry and dusting around her house (tr. 351-52, 541, 562-64), she does not meet Listing 1.02A.

### 3. The ALJ did not err in analyzing the plaintiff's subjective complaints of pain.

The plaintiff argues that the ALJ erred in determining that her subjective complaints of pain were not credible. Docket Entry No. 15, at 26-29. The ALJ indicated that he considered the plaintiff's symptoms and whether those symptoms were consistent with the record medical evidence "based on the requirements of 20 CFR §§ 404.1529 and 416.929 and SSRs 96-4p and 96-7p." (Tr. 21.) He found that

> [t]he [plaintiff] testified that she suffers from fibromyalgia/body pain, arthritis, back and stomach problems, high blood pressure, depression, sleep apnea, knee swelling, skin cancer, bad nerves, fatigue and difficulties with her hips and hands. The [plaintiff] stated that she is unable to stand for prolonged periods and that she spends most of the day resting. She explained that her son performs the housework and yardwork. However, the [plaintiff] admitted that she is able to prepare simple meals, do laundry, visit with her father and go to Church. On June 24, 2004, the [plaintiff] underwent a psychological evaluation. The [plaintiff] indicated that she dressed and bathed herself, shopped independently, drove, performed light household chores, attended church, visited with family members and prepared simple meals . . . .

> After considering the evidence of record, the undersigned finds that the [plaintiff's] medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

*Id.* The ALJ also noted that the record medical evidence did not support the plaintiff's complaints and referred to the results of an MRI of her lumbar spine and left knee, a CPAP titration test, a grip strength exam, and several range of motion assessments. (Tr. 24.)

The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision on credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the [plaintiff] and judge her subjective complaints." *See Buxton v. Halter*, 246 F. 3d 762, 773 (6th Cir. 2001) (internal citations

omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F. 3d at 1036).

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186 at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at 5. The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. *Id.*

Both the Social Security Administration ("SSA") and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. *See* 20 C.F.R. § 404.1529; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[43] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039. The second prong has two parts: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition, or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. *Id.* This test does not require

---

[43] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n. 2.

objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

There is objective medical evidence of underlying physical medical conditions: the plaintiff has been diagnosed with arthritis (tr. 136, 141, 144, 146, 148, 218, 357-58, 438, 440) and fibromyalgia. (Tr. 133, 141, 144, 146, 148, 163-65A, 168-69, 178-79, 186, 206-07, 214, 357-58, 444, 449, 542.) Given that the second prong of the *Duncan* test consists of two alternatives, the plaintiff must only meet one of the following two elements: the objective medical evidence "confirms the severity of the alleged pain arising from the condition" or the "objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c). The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of her pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2). Besides reviewing medical records to address the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 404.1529(c)(3).[44]

The ALJ determined that the plaintiff's subjective complaints of pain were not supported by the objective medical evidence in the record. (Tr. 24.) As previously discussed, although the

_____

[44] The seven factors under 20 C.F.R. § 404.1529(c)(3) include: (I) the plaintiff's daily activities, (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms, (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on her back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.), and (vii) other factors concerning plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

plaintiff was diagnosed with arthritis, the record medical evidence shows that the plaintiff had minimal swelling and no deformities in her joints (tr. 140, 357), that x-rays of her right hand and wrist were negative and revealed "no joint space narrowing or erosions to suggest an inflammatory or degenerative arthropathy" (tr. 201), that an MRI of her left knee showed only a "small joint effusion" (tr. 398), that she had five out of five upper and lower limb strength (tr. 357-58) and grip strength (tr. 357-58, 466), and that she had a full range of motion in her neck, shoulders, elbows, wrists, hips, knees, and ankles. (Tr. 466.) The objective record medical evidence simply does not support the plaintiff's complaints that her arthritis significantly limits her physical abilities.

Additionally, the ALJ concluded that the plaintiff's level of activity was inconsistent with her "statements concerning the intensity, persistence and limiting effects" of her arthritis and fibromyalgia.[45] (Tr. 21.) In making this determination, the ALJ relied on the plaintiff's statements to Dr. Blazina (tr. 351-52) and on her hearing testimony. (Tr. 562-64.) The plaintiff related to Dr. Blazina and/or testified that she was able to shop independently, dress and bathe herself with

---

[45] The Court of Appeals for the Sixth Circuit has cited the Seventh Circuit with approval in describing the difficulties in diagnosing fibromyalgia:

> [F]ibromyalgia, also known as fibrositis[,] is a common, but elusive and mysterious disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and-the only symptom that discriminates between it and other diseases of a rheumatic character-multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

*Huffaker v. Metro. Life Ins. Co.*, 271 Fed. Appx. 493, 2008 WL 822262, *6 n.2 (6th Cir. Mar. 25, 2008) (quoting *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 916 (7th Cir. 2003) (internal quotation marks, alterations, and citations omitted)).

some difficulty, drive a car, attend church, visit family, prepare simple meals, and do laundry and light dusting around her house. (Tr. 351-52, 562-64.) Although the ALJ found the plaintiff's arthritis and fibromyalgia to be severe (tr. 20), her ability to take part in multiple daily activities demonstrates that those impairments are not disabling.

The ALJ properly weighed the evidence in the record and did not err in finding that the plaintiff's allegations of disabling pain due to arthritis and fibromyalgia were not credible. The objective record medical evidence and the plaintiff's activities of daily living were considered by the ALJ in making his final determination. Thus, there is substantial evidence in the record to support the ALJ's finding that the plaintiff arthritis and fibromyalgia are not disabling.

### 4. The ALJ properly determined that the plaintiff could return to a reduced range of light work.

The plaintiff argues that the ALJ erred in finding that she could return to her past relevant work as an assembly worker. Docket Entry No. 15, at 3-6. The ALJ determined that the plaintiff could perform her "past relevant light exertional level job as an assembler because it does not exceed the [plaintiff's] current residual functional capacity for light work, the job allows the [plaintiff] to alternate sitting as well as standing and the job did not require any lifting and/or carrying." (Tr. 24-25.) The Regulations define light work as

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there

are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567, 416.967.

The plaintiff is correct that her impairments preclude her from performing a full range of light work, as defined by the Regulations. Docket Entry No. 15, at 5-6. As discussed *supra*, Dr. Hooper and three consultative DDS physicians, Dr. Surber, Dr. Patikas, and Dr. Johnson, all completed physical assessments on the plaintiff and evaluated what she could do over the course of an eight hour workday. (Tr. 355-59, 381-88, 464-72.) Each doctor found that the plaintiff could occasionally lift/carry varying amounts of weight, ranging from 5 to 25 pounds; Dr. Surber and Dr. Patikas determined that she could stand/walk up to or about six hours, Dr. Johnson found that she could stand/walk up to three hours, and Dr. Hooper noted that she could stand/walk less than two hours; and Dr. Surber, Dr. Patikas, and Dr. Johnson concluded that she could sit for up to or about six hours and Dr. Hooper determined that she could sit for four hours. *Id.* Dr. Surber, Dr. Patikas, and Dr. Johnson all found that the plaintiff's ability to push/pull was not limited, but Dr. Hooper concluded her ability to handle, finger, feel, push/pull were impaired. *Id.* Dr. Johnson also noted that the plaintiff needs to be able "to variate" between sitting and standing.

As discussed *supra*, Dr. Hooper's assessment was the most restrictive and was based largely on the plaintiff's subjective complaints, and the ALJ did not err in assigning it minimal weight. In comparing the three remaining evaluations with the Regulation's requirements for light work, two of the three evaluations satisfied the lift/carry 10 pounds occasionally requirement (tr. 358, 382-83), two of the three evaluations satisfied the "good deal of walking or standing requirement" (*id.*), and

all three evaluations satisfied the "sitting most of the time" requirement and the "some pushing and pulling of arm or leg controls" requirement. (Tr. 358, 382-83, 467); 20 C.F.R. §§ 404.1567, 416.967.

The Regulations provide that to be able to perform a "full or wide range light work," the plaintiff must "have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567, 416.967. While it could be argued that the physical evaluations of Dr. Surber, Dr. Patikas, and Dr. Johnson indicate that the plaintiff does not have an RFC to perform a "full or wide range of light work," the ALJ did not conclude that the plaintiff could perform a "full or wide range of light work." Tr. 24-25; 20 C.F.R. §§ 404.1567, 416.967. Rather, the ALJ specifically found that the plaintiff could perform her past job as an assembly worker because it allowed her to alternate between sitting and standing while she worked and it "did not require any lifting and/or carrying." (Tr. 24-25.) Although the plaintiff's previous job as an assembly worker is classified as light work, it would be classified as limited light work because of the accommodations that her employer made for her limitations. *See* Tr. 553-54. Given the physical evaluations of Dr. Surber, Dr. Patikas, and Dr. Johnson, the additional limitations assigned by the ALJ to the plaintiff's "light work" RFC, and the plaintiff's testimony that her previous job as an assembly worker accommodated those additional limitations, there is substantial evidence in the record to support the ALJ's conclusion that the plaintiff could return to her past job as an assembly worker.


## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 14) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

JULIET GRIFFIN
United States Magistrate Judge